JUDGE CASTEL

Benjamin J. Hanauer (*pending pro hac vice*)
Timothy S. Leiman (*pending pro hac vice*)
Andrew P. O'Brien (*pending pro hac vice*)
Charles J. Kerstetter (*pending pro hac vice*)
Alyssa Qualls
**United States Securities and Exchange Commission**
**Chicago Regional Office**
175 West Jackson Blvd., Suite 1450
Chicago, IL 60604
(312) 353-7390

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

# 18 CV    4352

|  |  |  |
|---|---|---|
| **UNITED STATES SECURITIES** | : | **ECF CASE** |
| **AND EXCHANGE COMMISSION,** | : | |
| | : | **COMPLAINT** |
| **Plaintiff,** | : | |
| | : | |
| v. | : | _____CIV._____ (      ) |
| | : | |
| **BRENT BORLAND, BORLAND CAPITAL** | : | |
| **GROUP, LLC, and BELIZE** | : | |
| **INFRASTRUCTURE FUND I, LLC** | : | **JURY DEMANDED** |
| | : | |
| **Defendants, and** | : | |
| | : | |
| **CANYON ACQUISITIONS, LLC, and** | : | |
| **ALANA LaTORRA BORLAND,** | : | |
| | : | |
| **Relief Defendants.** | : | |

Plaintiff United States Securities and Exchange Commission (the "SEC" or

"Commission") alleges as follows:

1.      This case centers on a fraudulent scheme perpetrated by Defendant Brent Borland

through two entities that he owned and controlled: (1) Borland Capital Group, LLC ("BCG") and

(2) Belize Infrastructure Fund I, LLC ("Belize Fund").

2.      Although Borland, BCG, and Belize Fund (collectively, "Defendants") used multiple holding companies and over a dozen bank accounts to perpetrate their fraud, their underlying scheme was simple. Between 2014 and June of 2017, Defendants sold at least $21.9 million of promissory notes (the "Notes") to at least 44 investors in at least eight states. Defendants promised investors that their money would be used as bridge financing to fund construction and development of an international airport in Placencia, Belize (the "Placencia Airport"). But, rather than use all of the funds as represented, Borland misappropriated more than $5.98 million of investor assets and used the stolen principal to fund his family's lavish lifestyle.

3.      Borland funneled investor funds to himself and his family using the account of another entity under his control, Relief Defendant Canyon Acquisitions, LLC ("Canyon") – a holding company owned by Borland and his wife, Relief Defendant Alana LaTorra Borland ("Alana"). From Canyon's account, Borland used investor funds to pay his family's expenses, including: (a) mortgage and property tax payments on the Borlands' multi-million dollar Florida mansion, (b) multiple luxury automobiles, (c) tuition for the Borlands' children at an elite private school, (d) $36,000 for the Borlands' membership at a posh beach club in Delray Beach, Florida, (e) nearly $10,000 for high-end watches, and (f) almost $2.7 million to pay off Alana's credit cards.

4.      While Borland and his family enjoyed the benefits of at least $5.98 million in purloined investor cash, Note investors were not so lucky. The maturity dates on almost all, if not all, of the Notes have passed without repayment and all of the Notes have slipped into default. To this day, the overwhelming majority of Note investors have been paid none of what they are owed – no interest payments and no return of principal.

5.      In the course of the fraud, Defendants repeatedly lied to – and hid material information from – investors. In addition to lying about the use of investor funds, Defendants promised outlandish returns with quick payment terms. But, while selling the Notes to new investors, Defendants hid the fact that the overwhelming majority of prior Notes were in default and prior Note investors had not been paid a dime of interest or principal.

6.      To make matters worse, Defendants perpetuated their fraudulent scheme by secretly re-pledging the same collateral to multiple investors. Defendants led investors to believe that their Notes were secured by valuable real estate that was (a) worth at least twice as much as the amount of the Note, (b) secured only that individual Note, and (c) would not be encumbered by any other liens or security interests. In reality, Borland pledged the same parcels of real estate to multiple investors and reported fake valuations for the properties to investors to make it appear that the parcels were worth twice the face value of the Note.

7.      By making material misrepresentations and omissions to investors, and by engaging in a fraudulent offering scheme, Borland, BCG and Belize Fund have committed securities fraud in violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5] and Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)].

8.      Borland's family – including Alana and his mother in-law – benefited from Defendants' fraud. And, the money that Borland took from investors to fund his family's lifestyle was only a fraction of the more than $14.4 million of investor funds that Borland funneled through Canyon. Canyon and Alana have no legitimate claim to the investor funds that they received as a result of Defendants' fraud and, therefore, were unjustly enriched by receiving those funds. Canyon and Alana are, therefore, proper Relief Defendants in this action.

9.      The SEC brings this lawsuit to stop Defendants' violations of the federal securities laws, to prevent further harm to investors, and to seek disgorgement and civil penalties stemming from Defendants' wrongdoing, among other remedies.

## JURISDICTION AND VENUE

10.      The SEC brings this action under Securities Act Section 20(b) [15 U.S.C. §77t(b)], and Exchange Act Sections 21(d) and (e) [15 U.S.C. §§78u(d) and 78u(e)].

11.      This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

12.      Venue is proper in this Court pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Many of the acts, practices, and courses of business constituting the violations alleged herein have occurred within the jurisdiction of the United States District Court for the Southern District of New York.

13.      Defendant Borland ran BCG out of its offices at 79 Madison Avenue in Manhattan and has conducted business relating to the Notes from that location, along with another office in this District, including having phone calls and meetings with existing and prospective Note investors.

14.      Defendants directly and indirectly made use of the means and instrumentalities of interstate commerce and of the mails in connection with the acts, practices, and courses of business alleged herein, and will continue to do so unless enjoined.

## DEFENDANTS

15.      **Brent Borland**, age 48, is a resident of Sag Harbor, New York, with a second home in Delray Beach, Florida. Borland is the sole owner of BCG – which he operates out of its Manhattan office – and Belize Fund. Borland co-owns Canyon with his wife, Alana. In 2011, the

Ontario (Canada) Securities Commission initiated an action against Borland, Canyon, and others. That action involved an unregistered securities offering where Borland and his codefendants sold investments in various real estate development projects, primarily projects in Belize. To resolve that action, Borland and his codefendants were required to repay investors, and cease offering the investments at issue. Borland was further barred from being an officer or director of any issuer, registrant, or investment fund subject to the jurisdiction of the Ontario Securities Commission.

16.     **Belize Infrastructure Fund I, LLC** is a Florida Limited Liability Company that purports to be in the business of selling promissory notes to finance the construction of an airport in Placencia, Belize. The Belize Fund is owned and operated by Borland.

17.     **Borland Capital Group, LLC**, is a Delaware Limited Liability Company headquartered in New York City. It has offices located at 79 Madison Avenue in Manhattan. According to its website, BCG claims to be "a multi-strategy investment holding company." Among other things, BCG purports to be active in "alternative investments such as . . . infrastructure investment, development, and monetization." BCG is owned and operated by Borland.

<b><u>RELIEF DEFENDANTS</u></b>

18.     **Canyon Acquisitions, LLC,** is a Nevada Limited Liability Company. Canyon is owned by Borland and Alana. Borland's mother in-law serves as Canyon's office manager and issues checks and money orders from Canyon's account at the Borlands' direction. As described below, in the course of Defendants' fraud, Canyon took at least $14.4 million of investor funds into its domestic checking account – money to which Canyon had no legitimate claim. Borland and Alana then used the Canyon account to pay for their own personal expenses.

19.     **Alana LaTorra Borland**, age 41, is a resident of Sag Harbor, New York, with a second home in Delray Beach, Florida. Alana is Brent Borland's wife and co-owns Canyon with Borland. As alleged below, in the course of Defendants' fraud, Alana received the benefit of investor funds to which she had no legitimate claim, including (a) mortgage and property tax payments on her home, (b) tuition payments for her children, (c) a family beach club membership, and (d) almost $2.7 million used to pay off her credit cards.

## FACTS

**Borland and His Entities:**

20.     Borland is the sole owner of BCG, a Manhattan-based firm that, according to its website, claims to be "a multi-strategy investment holding company" that is "active in…alternative investments such as….infrastructure investment."

21.     Among other projects, BCG claims to have invested millions of dollars in a large resort complex near Placencia, Belize and claims to have invested $24 million along with its Belizean partners towards constructing and developing a private airstrip near the purported resort project into an international airport. Borland claims that the airstrip – which he calls the Placencia International Airport – would, in addition to helping Borland and his partners sell real estate in a nearby planned development, be "a significant standalone revenue generator" and that, once operational, it would immediately receive 35 flights per day.

22.     Borland solicited investments in his purported Placencia Airport project through BCG and Belize Fund.

23.     Borland controlled both BCG and Belize Fund, exercising control over every aspect of their operations, including transactions to and from their bank accounts. Borland signed

all of the Notes issued by BCG and Belize Fund and all of the pledges of collateral issued to secure those Notes.

**Borland Sells Over $21.9 Million of Promissory Notes To Investors**:

24.     From at least 2014 through June 2017, Borland, BCG, and Belize Fund offered and sold promissory notes to investors in the United States. In that time, BCG and Belize Fund sold at least 66 Notes to at least 44 investors in at least 8 states, generating proceeds of at least $21.9 million. Most of the Notes were issued by Belize Fund, while some were issued in the name of BCG.

25.     In marketing the Notes to investors, Borland – and a BCG employee acting at his direction – told investors that the proceeds of the Notes would be used for the construction and development of the Placencia Airport. Borland told investors that he and a partner in Belize had invested $24 million in the airport and that he needed "bridge lenders" to provide additional, short-term funding for airport construction while he worked to secure more substantial, long-term financing from institutional investors to complete the project.

26.     Borland, BCG, and Belize Fund promised investors unusually generous returns and quick repayment. At a time when the federal funds rate was below 1% per year, the Notes generally provided for a 15% return after 3 months and 1% per month for each month after the first three months, effectively offering interest of 24% per year.

27.     The Notes also promised a quick pay-off. Most of the Notes had a 12 or 24-month term. Some of the Notes provided an even shorter term with a maturity date 3 months after the date of the Note.

28.     Borland, BCG, and Belize Fund told the Note investors that the Notes were "bridge financing" and would be repaid quickly. In fact, the Notes specified that while payment

would be due by the maturity date, the borrower – *i.e.,* BCG or Belize Fund – would be required to "pre-pay (retire)" the Note within seven days if a target amount of investment was obtained for the "Placencia International Airport Project." In other words, payment on the Note was due by the maturity date or when Defendants obtained long-term financing for the Placencia Airport – whichever came first.

29.     Borland told investors that he expected to close such long-term financing for the Placencia Airport in short order because the airport was an attractive investment. Indeed, Borland told at least one investor that he "guaranteed" that his investment would only be for a short term.

30.     Although the maturity of the Notes could be accelerated if BCG or Belize Fund obtained long-term financing for the Placencia Airport, BCG's and Belize Fund's payment obligations on the Notes were not contingent on such financing. Each Note specified that "[i]f the Borrower does not satisfy all amounts due on [the Note] on the Maturity Date, the Borrower will be in default" and that a penalty rate of interest would accrue until the Note was paid. In other words, regardless of whether Defendants obtained long-term financing for the Placencia Airport, the Notes were in default once the maturity date passed without payment of principal and interest.

31.     The Notes are "securities" as that term is defined in Exchange Act Section 3(a)(10) [15 U.S.C. § 78c(a)(10)] and Securities Act Section 2(a)(1) [15 U.S.C. § 77b(a)(1)].

32.     The Notes suggest the intended use of investors' principal. They specify that the "Bridge Note" would come due once sufficient financing was obtained for the "Placencia International Airport Project."

33.    Instead of a prospectus or offering memorandum, Borland used intermediate brokers to introduce the investment opportunity to investors. Borland and/or his BCG employee then offered a more detailed explanation of the investment to interested investors by telephone, e-mail, and web presentation. Borland and his BCG employee told investors during those calls, presentations, and in emails that their money would be used for construction of the Placencia Airport.

34.    Neither Borland nor his BCG employee told investors that any portion of their Note proceeds would be paid to Borland or his family. Nor did they mention any other uses of Note proceeds aside from the Placencia Airport.

**Borland's Misappropriation Of Investor Funds:**

35.    While Borland and his entities were raising $21.9 million from Note investors, Borland took at least $5.98 million of that money to fund his lavish lifestyle.

36.    Borland misappropriated the vast majority of that $5.98 million of investor cash by funneling it through Canyon, an entity that he owns with his wife, Alana, and which employed Alana's mother. From there, Borland and Alana directed Alana's mother to issue checks and wire transfers to pay the Borlands' personal expenses.

37.    From April 1, 2014 through September 29, 2017, Borland sent more than $14.4 million of Note proceeds to Canyon's domestic checking account. Although Canyon had some funds from other sources, that $14.4 million of investor cash represented more than 89% of the money taken into Canyon's account. None of the funds in the Canyon account was transferred to accounts in Belize or was otherwise used for construction projects in Belize.

38.     Instead, Borland and his wife used the Canyon account – and a BCG account that also was funded with Note proceeds – as their personal piggy-banks. From those accounts, the Borlands took at least $5.98 million to pay personal expenses.

39.     For example, between April 1, 2014 and September 29, 2017, the Borlands made the following personal expenditures from the Canyon account that was funded with misappropriated investor principal:

> (a) at least $925,785 in mortgage payments on properties owned by Borland and Alana, including their 6,000 square foot, multi-million dollar Florida mansion;
>
> (b) more than $61,940 in property taxes on Borland and Alana's Florida home in 2016 and 2017;
>
> (c) more than $97,000 to pay private school tuition for the Borlands' children;
>
> (d) more than $36,000 for the Borlands' membership and fees at a private beach club and day spa in Delray Beach, Florida;
>
> (e) more than $31,000 to a high-end department store;
>
> (f) more than $11,000 in dues to Alana's mother's homeowners association;
>
> (g) a nearly $10,000 payment to an online luxury watch website; and
>
> (h) more than $183,000.00 in cash withdrawals.

40.     Between April 4, 2014 and September 29, 2017, Borland and Alana also took at least $2.67 million from Canyon's account to pay off four credit card accounts in Alana's name. The credit card accounts were used primarily for personal expenses of the Borlands and none of the credit card charges related to airport construction in Belize.

41.     In addition, Borland and his wife used investor funds to buy luxury automobiles. For example:

    (a)  On March 2, 2015, Borland took $25,000 from the Canyon account to make a payment on a Mercedes G63 luxury Sport Utility Vehicle ("SUV") which has a sticker price over $140,000;

    (b)  In June 2015, Borland took $66,659.38 from a BCG account – which included co-mingled investor funds – which he sent to a Cadillac dealership in East Totowa, New Jersey; and

    (c)  On April 27, 2017, Borland directed a second payment of $61,937.50 from the same BCG account to the same Cadillac dealership toward the purchase of a Cadillac Escalade luxury SUV.

42.     In total, Borland misappropriated over $5.98 million from accounts holding co-mingled investor funds to pay for his family's lavish lifestyle, including payments that benefitted Alana.

43.     While he solicited funds from investors and then misappropriated investor funds for his family's expenses, Borland – acting through BCG, and Belize Fund – acted with scienter. Borland knew – or recklessly disregarded – that the overwhelming majority of assets in the Canyon account came from Note proceeds and that money from that account was being used to pay his family's personal expenses.

**Borland, BCG, and Belize Fund Lied To Investors About the Use of Investor Funds**:

44.     From 2014 through at least June 2017, Borland, BCG, and Belize Fund told investors (and prospective investors) that their principal would be used to fund construction and development of the Placencia Airport. Similarly, term sheets Defendants provided to investors represent that investors' proceeds will be used for "operating capital." No other use of investor principal was disclosed to investors.

45.     Those representations were false when made. While a portion of the invested funds may have been used to fund construction projects, Borland used at least 40% of investor funds for other purposes. Most significantly, as discussed at paragraphs 35-43 above, Borland used at least $5.98 million of investor principal to pay his family's personal expenses.

46.     In addition to using investor funds to pay personal expenses, Borland, BCG, and the Belize Fund diverted Note proceeds to fund real estate projects that had no relation to Belize construction projects and that were never discussed with investors. Specifically, Belize Fund sent $778,000 to a BCG account dedicated to a New York condominium investment at the New York Ritz Carlton Residences in White Plains, New York and another luxury condominium building in New Rochelle, New York. Borland, BCG, and Belize Fund did not tell Note investors that a portion of their principal would be used to fund investments in New York condominiums.

47.     Borland, BCG, and Belize Fund also diverted $1,431,568 of investor funds to pay third party brokers who introduced investors to BCG and Belize Fund.

48.     In sum, Borland, BCG, and Belize Fund took at least $8,940,666 of investor funds and used that money in ways that were not related to the disclosed purpose of the Notes – *i.e.*, to fund construction at the Placencia Airport and related projects in Belize. Those misused funds represent at least 40% of the all funds raised from Note investors.

49.     Defendants' misrepresentations to Note investors regarding use of funds were material. In making an investment decision, a reasonable investor would deem it important that – instead of using investor funds as promised (*i.e.,* to fund the construction of Placencia Airport) – approximately 40% of investor funds was diverted for other purposes, including unrelated real estate projects, investor commissions, and over $5.98 million for the Borlands' personal expenses.

50.     In making the misrepresentations and omissions identified above, Borland, BCG, and Belize Fund acted with scienter. At the time they told prospective investors about the nature of their investment, Borland, BCG, and the Belize Fund knew – or recklessly disregarded – that the representations were not true and that they had diverted a significant portion of investor funds for Borland's personal use and for other purposes unrelated to construction projects in Belize.

**Defendants' Fraudulent Pledging of the Same Collateral to Multiple Investors:**

51.     All Note investors received pledges of collateral as "security" for their notes. As collateral, Borland pledged parcels of real estate in Belize purportedly owned by Mayan Lagoon Estates, LTD ("Mayan Estates"). All of the pledges of Mayan Estates parcels were signed by Borland and one of his purported Belizean partners.

52.     The collateral pledge documents prohibited the pledged parcels of land from being transferred or encumbered in any way during the term of the pledge. With minor language deviations, the pledge documents each state that BCG and the Belize Fund "shall not transfer or encumber in any way this pledged property. Pledgor shall not permit any mortgages or liens to attach to the pledged property until the loan is repaid in its entirety."

53.     Despite the fact that the pledge documents prohibited the pledged property from being transferred or encumbered in any way during the term of the pledge, Borland, BCG and Belize Fund pledged the same parcels of property to multiple investors.

54.     Most investors were affected by this practice, as approximately 77% of the Notes were secured by collateral that Borland, BCG, and Belize Fund surreptitiously pledged to other investors.

55.     For example, between February and June of 2015, Borland pledged the same parcel of land – described as "Placencia North Block 36 Parcel 2169 Known as Lot 84 of the subdivision" – as collateral to secure Notes of at least 12 different investors. Borland did not inform any of the 12 investors that their collateral secured other Notes.

56.     As another example, the below chart reflects three instances where the same parcel of land – described as "Lot 31" – was pledged to secure three different Notes within weeks of one another in June of 2016:

**The Surreptitious Re-Pledging of Lot 31 to Three Investors**

| Date of Note | Term of Note | Investor | Amount of Note | Pledged Lot | Duration of Pledge | Value of Lot |
|---|---|---|---|---|---|---|
| 6-3-2016 | 12 mo. | Investor A | $250,000 | Lot 31 | 12 mo. | $500,000 |
| 6-24-2016 | 12 mo. | Investor B | $1,000,000 | Lot 31 | 12 mo. | $2,000,000 |
| 6-27-2016 | 12 mo. | Investor C | $100,000 | Lot 31 | 12 mo. | $200,000 |

57.     Borland signed each of the Collateral Pledge Agreements securing the three Notes identified in the above table. Each Collateral Pledge Agreement stated that: "Prior to obtaining [the investor's] written consent, [Mayan Estates] shall not transfer or encumber in any way this pledged property.  [Mayan Estates] shall not permit any mortgages or liens to attach to the pledged property until the loan is repaid in its entirety." Despite that fact, after using Lot 31 to secure the Note for Investor A, Borland encumbered Lot 31 with two additional security interests by re-pledging it as collateral to secure the Notes for Investor B and Investor C.

58.     In the case of the three investors identified in the above table, Borland not only improperly pledged the same collateral simultaneously to each of the three investors, he disclosed a very different valuation for the collateral each time he pledged it. Each time he pledged Lot 31 as collateral, Borland assigned a value to the lot designed to make it appear that the lot was worth twice the amount of the Note investment.

59.     Specifically, in the 24-day period between the three Notes, Borland disclosed three different valuations for Lot 31, ranging between $200,000 and $2,000,000. If Lot 31 even exists, at least two – and possibly all three – of the valuations that Borland provided for Lot 31 were fake.

60.     Borland's secret re-pledging of the same collateral to multiple investors – and Borland's disclosure of wildly different valuations for the same collateral for each Note it secured – was material. Borland, BCG, and the Belize Fund told investors that the collateral pledges would be exclusive. In making an investment decision, a reasonable investor would have found it important that their collateral was securing the Notes of other investors. Such duplicative pledging necessarily reduces the value of the collateral to any one investor and reduces the chance that the collateral – if it exists at all – could be used to secure the investment in the event of default.  A reasonable investor also would find it important that the identified collateral was assigned radically different valuations when securing other Notes.

61.     In pledging the same collateral to multiple investors – and assigning substantially different values to the same parcels when pledging the parcel to secure multiple Notes – Borland, BCG, and Belize Fund acted with scienter. Borland signed each of the Notes on behalf of BCG and Belize Fund and signed each of the collateral pledge documents related to those Notes. When he signed, Borland knew – or recklessly disregarded – that (1) the same parcels of real estate were being pledged to secure multiple Notes, (2) the collateral pledge documents expressly prohibited the Defendants from encumbering the collateral once pledged (effectively barring the Defendants from pledging the same parcel to multiple investors), and (3) the collateral pledge documents assigned very different valuations to the same parcel when securing multiple Notes (reflecting that at least some of the valuations were fake).

**Defendants Fail to Tell New Note Purchasers That Older Notes Were In Default**:

62.     With few exceptions, investors in the Notes have never received any interest payments or a return of any portion of their principal. Over the course of the scheme, virtually all, if not all, of the Notes have entered default as the maturity dates passed without repayment.

63.     In marketing the Notes to Investors, Borland, BCG, and Belize Fund touted the investment potential of the Placencia Airport and assured investors that they would be repaid on time (if not before).

64.     But, Borland, BCG, and Belize Fund failed to disclose to new Note investors that the overwhelming majority of prior Note investors had not been paid and that the prior Notes were in default.

65.     For example, on April 8, 2015, Borland, BCG, and Belize Fund sold a $150,000 Note to Investor D. That note provided for repayment in three months. But at that time, Belize Fund already was in default on nearly $3 million of Notes it had sold to prior investors. Like the Note sold to Investor D, the earlier notes provided for repayment in three months. Before he made his investment on the expectation that he would be repaid in three months, Investor D was not told that Belize Fund already had defaulted on nearly identical Notes with the same 3-month term.

66.     Investor D's Note has long passed its July 8, 2015 maturity date. But – to this day – Investor D has not been paid any interest or principal.

67.     Similarly, on March 30, 2016, a year after Investor D purchased his note – and over eight months after Investor D's Note entered default – Investor E bought a $500,000 note issued by Belize Fund. Though Investor E's Note had a 12-month term, Borland assured Investor E that long-term financing for the Placencia Airport was imminent and the Note would be repaid

16

within a few months. Investor E was never told that – at the time he made his investment – Belize Fund already had defaulted on Notes sold to Investor D and other investors.

68.     As with the other Notes, Investor E's Note is now in default and Investor E has not received any interest or principal payments.

69.     Defendants' misrepresentations and omissions related to prior Note defaults were material. In evaluating whether to invest in the Notes, a reasonable investor would consider it important that substantively identical Notes issued to prior investors were in default and that prior investors had received no interest or principal payments on their investment.

70.     In hiding prior Note defaults from Note investors, Borland, BCG, and Belize Fund acted with scienter. Borland signed each Note issued to investors, communicated with prospective investors about the Notes, and controlled every aspect of BCG's and Belize Fund's interactions with investors. In communicating with new investors, Borland, BCG, and Belize Fund knew – or recklessly disregarded – that Notes issued to prior investors were in default and that nearly all prior investors had received little if any payment on their investment.

**Borland Invokes the Fifth Amendment in Response to Questions Posed by the SEC:**

71.     As part of its investigation into the securities law violations identified in this Complaint, the SEC issued subpoenas to Borland, his second-in-command at BCG, his wife Alana, and his mother in-law, requiring each of them to appear and provide testimony under oath to the SEC regarding matters including the use of funds Borland raised from investors.

72.     Borland, his second-in-command, Alana, and Alana's mother each refused to provide substantive answers to the SEC's questions and instead invoked their right against self-incrimination under the Fifth Amendment to the U.S. Constitution.

## COUNT I

### Violations of Section 10(b) of the Exchange Act,
### and Exchange Act Rule 10b-5
### (Against Defendants Borland, BCG, and Belize Fund)

73.     Paragraphs 1 through 72 are realleged and incorporated by reference.

74.      As more fully described in paragraphs 1 through 72, Defendants Borland, BCG, and Belize Fund, in connection with the purchase and sale of securities, by the use of the means and instrumentalities of interstate commerce and by the use of the mails, directly and indirectly: used and employed devices, schemes and artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in acts, practices and courses of business which operated or would have operated as a fraud and deceit upon purchasers and prospective purchasers of securities.

75.     As described in more detail in paragraphs 1 through 72 above Defendants Borland, BCG, and Belize Fund each acted with scienter in that they knowingly or recklessly made the material misrepresentations and omissions and engaged in the fraudulent scheme identified above.

76.     By reason of the foregoing, Defendants Borland, BCG, and the Belize Fund violated Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5].

## COUNT II

### Violations of Section 17(a)(1) of the Securities Act
### (Against Defendants Borland, BCG, and the Belize Fund)

77.     Paragraphs 1 through 72 are realleged and incorporated by reference as though fully set forth herein.

78.     By engaging in the conduct described in paragraphs 1-72 above, Borland, BCG, and the Belize Fund, in the offer and sale of securities, by the use of the means and instruments of interstate commerce, directly or indirectly, employed devices, schemes and artifices to defraud.

79.     Defendants Borland, BCG, and the Belize Fund intentionally or recklessly engaged in the devices, schemes, and artifices described above.

80.     By reason of the foregoing, Defendants Borland, BCG, and the Belize Fund violated Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

### COUNT III

**Violations of Sections 17(a)(2) and (3) of the Securities Act**
**(Against Defendants Borland, BCG, and the Belize Fund)**

81.     Paragraphs 1 through 72 are realleged and incorporated by reference as though fully set forth herein.

82.     By engaging in the conduct described in paragraphs 1-72 above, Defendants Borland, BCG, and the Belize Fund, in the offer and sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, have:

       a.  obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

       b.  engaged in transactions, practices, or courses of business that operated or would operate as a fraud or deceit upon the purchasers of such securities.

83.     Defendants Borland, BCG, and the Belize Fund made the untrue statements and omissions of material fact and engaged in the transactions, practices and courses of business described above.

84.    By reason of the foregoing, Defendants Borland, BCG, and the Belize Fund have violated Sections 17(a)(2) and (3) of the Securities Act [15 U.S.C. § 77q(a)(2)-(3)].

## COUNT IV

### (Relief Defendants Canyon and Alana LaTorra Borland)

85.    Paragraphs 1 through 72 are realleged and incorporated by reference.

86.    As described in paragraphs 1-72 above, between April 2014 and October 2017, Defendants transferred investor funds for the benefit of Relief Defendants Canyon and Alana LaTorra Borland.

87.    The proceeds identified in paragraphs 1-72 are the proceeds of the violations committed by Defendants Borland, BCG, and the Belize Fund described in this Complaint.

88.    Relief Defendants Canyon and Alana LaTorra Borland have no legitimate claim to the amounts received from investors identified in paragraphs 1-72, and therefore were unjustly enriched by receiving those funds.

## RELIEF REQUESTED

**WHEREFORE,** the Commission respectfully requests that this Court:

### I.

Issue findings of fact and conclusions of law that defendants committed the violations charged and alleged herein.

### II.

Enter an Order of Permanent Injunction restraining and enjoining Defendants Borland, BCG, and the Belize Fund, their officers, agents, servants, employees, attorneys and those persons in active concert or participation with defendants who receive actual notice of the Order, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the

transactions, acts, practices or courses of business described above, or in conduct of similar

purport and object, in violation of Section 17(a) of the Securities Act [15 U.S.C. §§ 77q(a)], and

Section 10(b) of the Exchange Act [15 U.S.C. § 78j] and Rule 10b-5 [17 CFR § 240.10b-5]

thereunder.

### III.

Issue an Order requiring Defendants Borland, BCG, and the Belize Fund – on a joint and

several basis – to disgorge the ill-gotten gains received as a result of the violations alleged in this

Complaint, including prejudgment interest.

### IV.

Issue an Order requiring Relief Defendants Canyon Acquisitions and Alana LaTorra

Borland – jointly and severally with the Defendants – to disgorge the amounts that were

transferred for their benefit that the Defendants received as a result of the violations alleged in

this Complaint, including prejudgment interest.

### V.

With regard to the Defendants' violative acts, practices and courses of business set forth

herein, issue an Order imposing upon Defendants Borland, BCG, and the Belize Fund

appropriate civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)],

and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

### VI.

Retain jurisdiction of this action in accordance with the principals of equity and the

Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and

decrees that may be entered or to entertain any suitable application or motion for additional relief

within the jurisdiction of this Court.

## VII.

Grant such other relief as this Court deems appropriate.

## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission hereby requests a trial by jury.

May 16, 2018

**UNITED STATES SECURITIES
AND EXCHANGE COMMISSION**

By: _____

Alyssa Qualls (AQ-4247) (quallsa@sec.gov)
Benjamin J. Hanauer (hanauerb@sec.gov)
*(pro hac vice pending)*
Timothy S. Leiman (leimant@sec.gov)
*(pro hac vice pending)*
Andrew P. O'Brien (obriena@sec.gov)
*(pro hac vice pending)*
Charles J. Kerstetter (kerstetterc@sec.gov)
*(pro hac vice pending)*
Chicago Regional Office
175 West Jackson Blvd., Suite 1450
Chicago, IL 60604
Telephone: (312) 353-7390

*Attorneys for Plaintiff*

22