JUDGE CASTEL

# 18 CV 4352

## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES SECURITIES<br>AND EXCHANGE COMMISSION,<br><br>    Plaintiff,<br><br>v.<br><br>BRENT BORLAND, BORLAND CAPITAL<br>GROUP, LLC, and BELIZE<br>INFRASTRUCTURE FUND I, LLC<br><br>    Defendants, and<br><br>CANYON ACQUISITIONS, LLC, and<br>ALANA LaTORRA BORLAND,<br><br>    Relief Defendants. | CASE NO. 18-cv- |

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S
MEMORANDUM OF LAW IN SUPPORT OF ITS EMERGENCY APPLICATION
FOR AN ORDER TO SHOW CAUSE, TEMPORARY RESTRAINING ORDER,
PRELIMINARY INJUNCTION, ASSET FREEZE AND OTHER RELIEF**

Alyssa Qualls (AQ-4247)
Benjamin J. Hanauer
(*pro hac vice pending*)
Timothy S. Leiman
(*pro hac vice pending*)
Andrew P. O'Brien
(*pro hac vice pending*)
Charles J. Kerstetter
(*pro hac vice pending*)

Attorneys for Plaintiff
U.S. Securities and Exchange Commission
Chicago Regional Office
175 West Jackson Blvd., Suite 1450
Chicago, IL 60604
Telephone: (312) 353-7390

**Table of Contents**

**Statement of Facts** ........................................................................................................4

   A.  The Defendants and Relief Defendants ...............................................................5

   B.  Defendants' Fraudulent Content ..........................................................................6

      1. Defendants Told Investors Their Money Would Finance the Placencia Airport ...........6

      2. Defendants Lied About the Use of Investor Funds, and Concealed that Borland
         Misappropriated a Least $5.98 Million of Investor Money for His Family's
         Expenses.........................................................................................................9

      3. Defendants Fraudulently Pledged the Same Collateral to Multiple Investors ..............11

      4. Defendants Concealed That Earlier-Issued Notes Were in Default .............................12

      5. Defendants Refused to Provide Testimony and Documents to the SEC ......................13

      6. Defendants' Significant Financial Obligations, Attempts to Dissipate Assets, and
         Ongoing Solicitation of Investors .................................................................14

**Argument** ...................................................................................................................15

  I.  Defendants Should Be Temporarily Restrained and Preliminarily Enjoined From Further
     Violations Of  The Federal Securities Laws and From Soliciting Or Accepting Additional
     Investments .................................................................................................15

     A.  The Commission Has Made a Substantial Showing that Defendants Violated the
         Antifraud Provisions of the Securities Act and Exchange Act.....................................16

     B.  A High Risk Exists that Defendants Will Continue Their Violations...........................18

  II.  The Court Should Order An Asset Freeze and Repatriation .............................................20

  III.  The Court Should Order An Accounting .....................................................................22

  IV.  The Court Should Enter An Order Permitting Expedited Discovery And Prohibiting The
     Destruction Of Documents .......................................................................................23

**Conclusion** ...............................................................................................................24

**Table of Authorities**

**Cases**

*Aaron v. SEC,*
    446 U.S. 680 (1980) ................................................................. 16

*Abdul Wali v. Coughlin,*
    754 F.2d 1015 (2d Cir. 1985) ................................................... 21

*Basic Inc. v. Levinson,*
    485 U.S. 224 (1988) ................................................................. 16

*Fischer v. New York Stock Exchange,*
    408 F. Supp. 745 (S.D.N.Y. 1976) .......................................... 16

*Heyman v. Heyman,*
    356 F. Supp. 958 (S.D.N.Y. 1973) .......................................... 16

*In re Sunbeam Sec. Litig.,*
    89 F. Supp. 2d 1326 (S.D. Fla. 1999) ...................................... 18

*Richter v. Achs,*
    962 F. Supp. 31. (S.D.N.Y. 1997) ........................................... 16

*SEC v. Bloom,*
    No. 88 Civ. 201, 1988 U.S. Dist. LEXIS 2487 (S.D.N.Y. Jan. 12, 1988) ............................. 23

*SEC v. Byers,*
    No. 08 Civ. 7104, 2009 WL 33434 (S.D.N.Y. Jan. 7, 2009) ......................................... 20, 21

*SEC v. Capital Counsellors, Inc.,*
    512 F.2d 654 (2d Cir. 1975) ..................................................... 20

*SEC v. Cavanagh,*
    155 F.3d 129 (2d Cir. 1998) .............................................. *passim*

*SEC v. Commonwealth Chem. Sec., Inc.,*
    574 F.2d 90 (2d Cir. 1978) ...................................................... 19

*SEC v. Gonzalez de Castilla,*
    145 F. Supp. 2d 402 (S.D.N.Y. 2001) ...................................... 21

*SEC v. Hasho,*
    784 F. Supp. 1059 (S.D.N.Y. 1992) ......................................... 17

*SEC v. Heden,*
    51 F. Supp. 2d 296 (S.D.N.Y. 1999) ........................................ 21

*SEC v. Infinity Group Co.*,
    212 F.3d 180 (3d Cir. 2000) ................................................................................... 20

*SEC v. Lybrand*,
    No. 00 Civ. 1387, 2000 WL 913894 (S.D.N.Y. July 6, 2000) ................................ 23

*SEC v. Manor Nursing Ctrs., Inc.*,
    458 F.2d 1082 n.3 (2d Cir. 1972) .................................................................... 18, 22

*SEC v. Margolin*,
    No. 92 Civ. 6307, 1992 WL 279735 (S.D.N.Y. Sept. 30, 1992) ............................ 21

*SEC v. Mgmt. Dynamics, Inc.*,
    515 F.2d 801 (2d Cir. 1975) ............................................................ 15-16, 18, 20

*SEC v. Monarch Funding Corp.*,
    192 F.3d 295 (2d Cir. 1999) ................................................................................... 16

*SEC v. Musella*,
    578 F. Supp. 425 (S.D.N.Y. 1984) ........................................................................ 19

*SEC v. Oxford Capital Sec., Inc.*,
    794 F. Supp. 104 (S.D.N.Y. 1992) .................................................................... 22-23

*SEC v. Ramoil Mgmt., Ltd.*,
    No. 01 Civ. 9057, 2007 WL 3146943 (S.D.N.Y. Oct. 25, 2007) ........................... 16

*SEC v. Research Automation Corp.*,
    585 F.2d 31 (2d Cir. 1978) ..................................................................................... 17

*SEC v. Stanard*,
    No. 06 Civ. 7736, 2009 WL 196023 (S.D.N.Y. Jan. 27, 2009) ............................. 16

*SEC v. Texas Gulf Sulfur Co.*,
    401 F.2d 833 (2d Cir. 1968) ................................................................................... 17

*SEC v. Unifund SAL*,
    910 F.2d 1028 (2d Cir. 1990) .......................................................................... 20, 21

*Smith v. SEC*,
    653 F.3d 121 (2d Cir. 2011) ...................................................................... 20, 21, 22

**Rules**

Fed. R. Civ. P. 30(a), 33(a), 34(b) ............................................................................ 23

17 C.F.R. § 240.10b-5(b) ............................................................................... 3, 16, 18

Local Civil Rule 6.1 ................................................................................................... 4

**Statutes**

Section 17(a) of the Securities Act of 1933; 15 U.S.C. § 77q(a) ........................................ 3, 16, 18

Section 10(b) of the Securities Exchange Act of 1934; 15 U.S.C. § 78j(b) ...................... 3, 16, 18

Section 20(b) of the Securities Act of 1933; 15 U.S.C. § 77t(b) .................................................. 15

Section 21(d) of the Securities Exchange Act of 1934; 15 U.S.C. § 78u(d) ............................... 15

Plaintiff United States Securities and Exchange Commission (the "Commission" or "SEC") respectfully submits this memorandum of law in support of its application for emergency relief to protect investors from an offering fraud perpetrated by Defendant Brent Borland through two entities that he owns and controls:  Defendants Borland Capital Group, LLC ("BCG") and Belize Infrastructure Fund I, LLC ("Belize Fund").  Based on lies and deceit, Borland, BCG, and Belize Fund have raised at least $21.9 million, since 2014, by selling promissory notes to at least 40 investors throughout the United States.

To raise this money, Borland and his companies falsely promised outlandish returns with quick repayment.  Defendants told investors that their money would be used as bridge financing to fund construction of an international airport in Placencia, Belize (the "Placencia Airport").  But, rather than use investors' money as represented, Borland misappropriated more than $5.98 million of investor assets to fund his family's lavish lifestyle.

Borland funneled investor funds to himself and his family using the account of another entity under his control, Relief Defendant Canyon Acquisitions, LLC ("Canyon Acquisitions"), a holding company owned by Borland and his wife, Relief Defendant Alana LaTorra Borland ("Alana").  From Canyon Acquisitions' account, Borland spent millions of dollars of investor money for personal uses, including:  (a) mortgage and tax payments on the Borlands' $3.5 million Florida mansion, (b) multiple luxury automobiles, (c) tuition for the Borlands' children at an elite private school, (d) $36,000 for the Borlands' membership at a posh Florida beach club, (e) nearly $10,000 for high-end watches, and (f) almost $2.7 million to pay off Alana's credit cards.  Investors were never told that any, much less a significant portion, of their investment proceeds would be used for purposes unrelated to the Placencia Airport or to fund the Borlands' life of luxuries.

1

While Borland and his family enjoyed the benefits of at least $5.98 million in purloined investor cash, his investors have suffered.  The maturity dates on the promissory notes have passed without repayment and the notes have slipped into default.  To this day, the overwhelming majority of investors have been paid none of what they are owed – no interest payments and no return of principal.  Nevertheless, while promising quick and hefty returns, Defendants hid from investors that nearly all of the prior promissory notes were in default and earlier investors had not been paid a dime of interest or principal.

To make matters worse, Borland, BCG, and Belize Fund perpetuated their fraudulent scheme by secretly re-pledging the same collateral to multiple investors.  Defendants led investors to believe that their notes were secured by valuable real estate that (a) was worth at least twice as much as the amount of the note, (b) secured only that individual note, and (c) would not be encumbered by any other liens or security interests.  In reality, Borland pledged the same parcels of real estate to multiple investors and reported fake valuations for the properties to investors to make it appear the parcels were worth twice the face value of the note.

During the SEC's investigation, Borland, his second-in-command at BCG, his wife, and his mother-in-law each have refused to provide testimony by invoking their Fifth Amendment privileges against self-incrimination.  These individuals, as well as BCG and Belize Fund, also have failed to produce documents in the face of SEC subpoenas.  At least three investors have sued Borland, with one obtaining a settlement and two securing default judgments – none of which have been paid.  In the meantime, Borland and Alana have listed their $3.5 million Florida home for sale.  And the only way Defendants seem able to repay investors is to continue their fraud by soliciting fresh funds from unwitting investors.  Indeed, Borland and his companies appear to be currently and actively seeking new investment funds.

The accompanying declarations and exhibits annexed thereto provide ample evidence not only of Defendants' wrongdoing, but also of the SEC's substantial concern that the Defendants may dissipate the assets necessary to support a judgment in this action and, absent an injunction, will continue to solicit additional investors or accept new investments from existing investors.

For these reasons and those detailed below, the SEC respectfully requests that the Court:

(1)    Enter an order directing Defendants to show cause why an order should not be entered, pending a final disposition of this action:  preliminarily enjoining Borland, BCG, and Belize Fund from violating Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a), Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5(b); preliminarily enjoining Defendants from soliciting investors or accepting additional investor funds; freezing Defendants' assets; and prohibiting the destruction, alteration or concealment of documents;

(2)    Enter an order, pending adjudication of the foregoing, temporarily restraining Defendants from violating Section 17(a) of the Securities Act, and Section 10(b) and Rule 10b-5 of the Exchange Act; temporarily prohibiting Defendants from soliciting investors or accepting additional investor funds; freezing Defendants' assets; directing each Defendant to repatriate assets that presently may be located outside of the United States that were obtained directly or indirectly from investors; prohibiting the destruction, alteration or concealment of documents; directing each of the Defendants to quickly provide verified accountings; and providing that the SEC may take expedited discovery in preparation for a hearing on the order to show cause;

(3)      Enter an order directing Relief Defendants to show cause why an order should not

be entered, pending a final disposition of this action, freezing Alana's and Canyon

Acquisitions' assets; and prohibiting the destruction, alteration or concealment of

documents; and

(4)      Enter an order, pending adjudication of the foregoing, freezing Relief Defendants'

assets; directing each Relief Defendant to repatriate assets that presently may be located

outside of the United States that were obtained directly or indirectly from investors;

prohibiting the destruction, alteration or concealment of documents; directing each Relief

Defendant to quickly provide verified accountings; and providing that the SEC may take

expedited discovery relating to the Relief Defendants in preparation for a hearing on the

order to show cause.

## STATEMENT OF FACTS

The facts and evidence in support of this emergency application are contained in the

SEC's Complaint, the declarations of SEC staff members Donald Ryba and Andrew O'Brien,

investor declarations (attached to the O'Brien Declaration) and the Rule 6.1 declaration of

Charles Kerstetter, and the accompanying exhibits.  These materials demonstrate that (a)

Defendants have engaged in a fraudulent securities offering; (b) at least 44 victims have invested

at least $21.9 million with Defendants; (c) Defendants have failed to deploy investor proceeds in

the manner represented to investors; (d) Defendants have failed to pay investors the promised

returns; (e) Defendants misappropriated their victims' funds; (f) significant assets that could be

used to repay investors are at imminent risk of dissipation; (g) Defendants are apparently

continuing to solicit new investments; and (h) Borland, his second-in-command, his wife, and his

4

mother-in-law, have each refused to answer the SEC's questions and instead invoked their Fifth Amendment privileges against self-incrimination.

### A. The Defendants and Relief Defendants

Defendant Brent Borland, age 48, resides in Sag Harbor, New York, and owns a second residence in Delray Beach, Florida. (Declaration of Donald Ryba ("Ryba Dec."), ¶ 13). Borland is the sole owner of Defendants BCG and Belize Fund, and exercises control over every aspect of their operations. (Declaration of Andrew O'Brien ("O'Brien Dec."), ¶ 5). Defendant Belize Fund is a Florida limited liability company that purports to be in the business of selling promissory notes to finance the construction of an airport and related developments in Placencia, Belize. (Ryba Dec., ¶ 8). Defendant BCG is a Delaware limited liability company headquartered in Manhattan. (*Id.*, ¶ 12). On its website, BCG claims to be "a multi-strategy investment holding company" active in "alternative investments such as . . . infrastructure investment, development, and monetization." (O'Brien Dec., ¶ 16). Borland operates Belize Fund out of BCG's Manhattan office. (O'Brien Dec., ¶ 5).

Relief Defendant Alana Borland is Borland's wife. (Ryba Dec., ¶ 13). Borland and Alana are the co-owners of Relief Defendant Canyon Acquisitions, a Nevada limited liability company. (O'Brien Dec., ¶ 14). Alana's mother serves as Canyon Acquisitions' office manager and issues checks and money orders from Canyon Acquisitions' bank accounts at the Borlands' direction. (O'Brien Dec., ¶ 15). As discussed below, the Relief Defendants were unjustly enriched by receiving millions of dollars of the defrauded investors' proceeds, and have no legitimate claim to the moneys and assets they received at the investors' expense.

Borland has previously run afoul of securities regulators for offering investments related to Belize. In 2011, the Ontario (Canada) Securities Commission initiated an action against

Borland, Canyon, and others. (Ryba Dec., ¶ 49). That action involved an unregistered securities offering where Borland and his codefendants sold investments in various real estate development projects, primarily projects in Belize. (*Id.*). To resolve that action, Borland and his codefendants were required to repay investors, and cease offering the investments at issue. (*Id.*). Borland was further barred from being an officer or director of any issuer, registrant, or investment fund subject to the jurisdiction of the Ontario Securities Commission. (*Id.*).

### B. Defendants' Fraudulent Conduct

From at least 2014 through at least June 2017, Borland, BCG, and Belize Fund offered and sold promissory notes to investors in at least eight states (the "Notes"). (O'Brien Dec., ¶ 6). In that time, BCG and Belize Fund sold at least 66 Notes to at least 44 investors, generating proceeds of at least $21.9 million. (Ryba Dec., ¶¶ 14, 16). Most of the Notes were issued by Belize Fund, while some were issued in the name of BCG. (Ryba Dec., ¶ 14). Borland controlled the content of and signed all of the Notes and pledges of collateral issued to secure those Notes. (Ryba Dec., ¶ 17).

### 1. Defendants Told Investors Their Money Would Finance the Placencia Airport

In marketing the Notes to investors, Borland – and a BCG employee acting at his direction – told investors that the proceeds of the Notes would be used to further the construction and development of an airport in Placencia, Belize (the "Placencia Airport"). (Ryba Dec., ¶¶ 14, 15, 22; O'Brien Dec., ¶ 7; O'Brien Dec., Ex. C, ¶¶ 2-4, 9; O'Brien Dec., Ex. D, ¶¶ 2-3, 9). Borland told investors that he and a partner in Belize had invested $24 million in the airport and that he needed "bridge lenders" to provide additional, short-term funding for airport construction while he worked to secure more substantial, long-term financing from institutional investors to

6

complete the project.  (Ryba Dec., ¶¶ 14-15, 20; O'Brien Dec., ¶ 7; O'Brien Dec., Ex. C, ¶¶ 2-4, 9; O'Brien Dec., Ex. D, ¶¶ 2-4, 9).

In return for their investment funds, Borland, BCG, and Belize Fund promised investors unusually generous returns and quick repayment.  At a time when the federal funds rate was below 1% per year, the Notes provided for a 15% return after 3 months and 1% per month for each month after the first three months, effectively offering interest of 24% per year.  (Ryba Dec., ¶ 18).  The Notes also promised a quick pay-off.  Most of the Notes had a 12 or 24-month term, while some provided an even shorter term with a maturity date 3 months after the date of the Note.  (Ryba Dec., ¶ 19).

Borland, BCG, and Belize Fund told the Note investors that the Notes were "bridge financing" for developing the Placencia Airport, and would be repaid quickly.  (Ryba Dec., ¶¶ 14-15, 20; O'Brien Dec., ¶ 7; O'Brien Dec., Ex. C, ¶¶ 2-4, 9; O'Brien Dec., Ex. D, ¶¶ 2-4, 9). The Notes specified that while payment would be due by the maturity date, BCG or Belize Fund would be required to "pre-pay (retire)" the Note within seven days if a target amount of investment was obtained for the "Placencia International Airport Project."  (Ryba Dec., ¶ 20). Borland advised investors that he expected to close such long-term financing in short order because the airport was an attractive investment.  (Ryba Dec., ¶ 20; O'Brien Dec., ¶ 7).  Indeed, Borland told at least one investor that he "guaranteed" that his investment would only be for a short term.  (O'Brien Dec., ¶ 22).

Although the maturity of the Notes could be accelerated if BCG or Belize Fund obtained long-term financing for the Placencia Airport, BCG's and Belize Fund's payment obligations on the Notes were not contingent on such financing.  The Notes specified that "[i]f the Borrower does not satisfy all amounts due on [the Note] on the Maturity Date, the Borrower will be in

default" and that a penalty rate of interest would accrue until the Note was paid.  (Ryba Dec., ¶ 21).  In other words, regardless of whether Defendants obtained long-term financing for the Placencia Airport, the Notes were in default once the maturity date passed without payment of principal and interest.

Instead of a prospectus or offering memorandum, Borland used intermediate brokers to introduce the investment opportunity to investors.  (Ryba Dec., ¶ 22).  Borland and/or his BCG employee then offered a more detailed explanation to interested investors by telephone, e-mail, and web presentation. (*Id.*).  Borland and his employee told investors during those calls, presentations, and in emails that their money would be used for construction and development of the Placencia Airport.  (*Id.*; O'Brien Dec., ¶ 7; O'Brien Dec., Ex. C, ¶¶ 2-3; O'Brien Dec., Ex. D, ¶¶ 2-3)

Neither Borland nor his BCG employee told investors that any portion of their Note proceeds would be paid to Borland or his family.  (Ryba Dec., ¶ 23; O'Brien Dec., ¶ 7; O'Brien Dec., Ex. C, ¶ 9; O'Brien Dec., Ex. D, ¶ 9).  Nor did they mention any use of Note proceeds other than construction of the Placencia Airport.  (Ryba Dec., ¶ 23; O'Brien Dec., ¶ 7; O'Brien Dec., Ex. C, ¶ 9; O'Brien Dec., Ex. D, ¶ 9).  Similarly, neither the Notes nor any other materials provided to investors disclose that investor moneys would be diverted to non-business purposes or for Borland's personal benefit.  (Ryba Dec., ¶ 23; O'Brien Dec., ¶ 7; O'Brien Dec., Ex. C, ¶ 9; O'Brien Dec., Ex. D, ¶ 9)  Rather, term sheets Defendants provided to investors along with the Notes suggest that investor money would be deployed for legitimate business expenses.  To that end, the term sheets represent that investors' proceeds will be used for "operating capital." (Ryba Dec., ¶ 23)

## 2. Defendants Lied About the Use of Investor Funds, and Concealed that Borland Misappropriated At Least $5.98 Million of Investor Money for His Family's Expenses

As described above, the only use of the Note proceeds that Defendants disclosed to investors related to the development of the Placencia Airport. Those representations were, at best, misleading. To the extent Borland directed any investor funds towards developing the Placencia Airport, Borland nevertheless used at least 40% of investor funds for other purposes.[1] Most significantly, as detailed below, Borland used at least $5.98 million of the $21.9 raised from investors to pay his family's personal expenses.

From April 1, 2014 through September 29, 2017, Borland sent approximately $14.5 million of Note proceeds to Relief Defendant Canyon Acquisitions' checking account. (Ryba Dec., ¶ 38). Although Canyon Acquisitions had some funds from other sources, the $14.5 million of investor cash represented more than 89% of the money taken into Canyon Acquisitions' account. (*Id.*). From there, Borland and his wife used the Canyon Acquisitions account -- and a BCG account that also was funded with Note proceeds -- as their personal piggy-bank. (Ryba Dec., ¶ 40). From the Canyon Acquisitions account alone, the Borlands took at least $5.98 to pay personal expenses. (*Id.*).

For example, the Borlands made the following personal expenditures from the Canyon Acquisition bank account that was funded with misappropriated investor principal: (a) at least $925,785 in mortgage payments on properties owned by Borland and Alana; (b) more than $61,940 in property taxes on Borland and Alana's Florida home in 2016 and 2017; (c) more than

---

[1] Because Borland invoked his Fifth Amendment privilege, and Defendants failed to produce subpoenaed financial records, the SEC cannot ascertain whether Defendants deployed *any* investor funds towards the Placencia Airport. (Ryba Dec., ¶ 46). In any event, bank and credit card statements obtained by the SEC show that at least $8.94 million of the $21.9 million raised from investors was spent on expenditures unrelated to construction or development projects in Belize. (*Id.*, ¶ 45; O'Brien Dec., ¶¶ 11-12).

$97,000 to pay private school tuition for the Borlands' children; (d) more than $36,000 for the Borlands' membership and fees at a private beach club and day spa in Florida; (e) more than $31,000 to a high-end department store; (f) more than $11,000 in dues to Borland's mother-in-law's (Alana's mother) homeowners association; (g) nearly $10,000 to an online luxury watch website, (h) more than $183,000 in cash withdrawals; and (i) a $25,000 payment on a Mercedes G63 luxury SUV which has a sticker price over $140,000.  (Ryba Dec., ¶ 41).

On top of those expenditures, in 2015 Borland directed more than $66,000 from a BCG account – which included co-mingled investor funds – to a New Jersey Cadillac dealership. (Ryba Dec. ¶ 42).  Two years later, in 2017, Borland directed a $61,937 payment from the same BCG account to the same dealership.  (Ryba Dec.  ¶ 42)

All the while, Borland and Alana took money from Canyon Acquisitions' bank account to pay off Alana's American Express credit cards.  (Ryba Dec. ¶ 33).  Between April 4, 2014 and September 29, 2017, Borland and Alana used money from the account to settle a whopping $2.67 million in credit card charges.  (*Id.*).  Those credit card accounts were used for personal expenses of the Borlands and none of the credit card charges related to airport construction in Belize. (O'Brien Dec., ¶¶ 11-12).

In addition to using more than $5.98 million in investor funds to pay personal expenses, Borland, BCG, and the Belize Fund diverted Note proceeds to fund real estate projects that had no relation to Belize construction projects and that were never discussed with investors.  For instance, Belize Fund sent $778,000 to a BCG account dedicated to luxury condominium investments in affluent New York City suburbs.  (Ryba Dec., ¶ 43).  Borland, BCG, and Belize Fund also diverted at least $1,431,568 of investor funds to pay third party brokers who located investors.  (*Id.*, ¶ 44).  As with the other expenditures unrelated to a Belize airport, Defendants

10

did not disclose to Note investors that a portion of their principal would be used to fund investments in New York condominiums or to pay the commissions of brokers who introduced investors to Borland. (*Id.*, ¶ 23; O'Brien Dec. Ex. C, ¶ 9; O'Brien Dec., Ex. D, ¶ 9).

In sum, Defendants took at least $8,940,666 of investor funds and used that money in ways that were not related to the disclosed purpose of the Notes – *i.e.*, to fund construction of the Placencia Airport and related projects in Belize. (Ryba Dec., ¶ 45). Those misused funds represent at least 40% of the $21.9 million raised from Note investors. (Ryba Dec., ¶ 45).

### 3.   Defendants Fraudulently Pledged the Same Collateral to Multiple Investors

Along with their Notes, investors received pledges of collateral as "security" for their investments. (Ryba Dec., ¶¶ 24-25; O'Brien Dec., Ex. C, ¶ 6; O'Brien Dec., ¶ 6). As collateral, Borland pledged parcels of real estate in Belize purportedly owned by Mayan Lagoon Estates, LTD ("Mayan Estates"). (Ryba Dec., ¶ 25; O'Brien Dec., Ex. C, ¶ 6; O'Brien Dec., ¶ 6). Borland signed all of the collateral pledges. (Ryba Dec., ¶ 25; O'Brien Dec., Ex. C, ¶ 6; O'Brien Dec., ¶ 6). The pledge documents prohibited the pledged parcels of land from being transferred or encumbered in any way during the term of the pledge. With minor language deviations, each collateral pledge states that BCG and Belize Fund "shall not transfer or encumber in any way this pledged property. Pledgor shall not permit any mortgages or liens to attach to the pledged property until the loan is repaid in its entirety." (Ryba Dec., ¶ 25; O'Brien Dec., Ex. C, ¶¶ 6-7; O'Brien Dec., ¶¶ 6-7).

Despite the pledge documents prohibiting the pledged property from being transferred or encumbered in any way, Borland, BCG and Belize Fund pledged the same parcels of property to multiple investors. For example, between February and June of 2015, Borland pledged the same parcel of land – described as "Placencia North Block 36 Parcel 2169 Known as Lot 84 of the

11

subdivision" – as collateral to secure Notes of at least 12 different investors. (Ryba Dec., ¶ 26).

Borland similarly pledged another parcel of land, described as "Lot 31," to secure three

additional Notes issued in June 2016. (*Id.*, ¶¶ 26-27). Almost all investors were affected by this

practice. Of the 57 Notes obtained by the SEC, 44 of the Notes (over 77%) were secured by

collateral that Defendants surreptitiously pledged to other investors. (*Id.*, ¶ 26). Borland did not

inform any investors that their collateral secured other Notes. (*Id.*, ¶ 26; O'Brien Dec., Ex. C, ¶

10; O'Brien Dec., ¶ 10).

For certain of the notes, Borland not only simultaneously pledged the same collateral to

multiple investors, he disclosed a very different valuation for the collateral each time he pledged

it. (Ryba Dec., ¶ 27). For example, each time he pledged Lot 31 as collateral, Borland assigned

a different value to the lot, so it would appear that the lot was worth twice the amount of the

Note investment. (*Id.*). The table below illustrates this practice:

| Date of Note | Term of Note | Investor | Amount of Note | Pledged Lot | Duration of Pledge | Value of Lot |
|---|---|---|---|---|---|---|
| 6-3-2016 | 12 mo. | Investor A | $250,000 | Lot 31 | 12 mo. | $500,000 |
| 6-24-2016 | 12 mo. | Investor B | $1,000,000 | Lot 31 | 12 mo. | $2,000,000 |
| 6-27-2016 | 12 mo. | Investor C | $100,000 | Lot 31 | 12 mo. | $200,000 |

(Ryba Dec., ¶ 27). Thus, to the extent Lot 31 even exists, at least two – and possibly all three –

of the valuations that Borland provided for Lot 31 were fake.

### 4. Defendants Concealed That Earlier-Issued Notes Were in Default

With few exceptions, investors in the Notes have never received any interest payments or

a return of any portion of their principal. Over the course of the scheme, nearly all, if not all, of

the Notes have entered default as the maturity dates passed without repayment. (Ryba Dec., ¶

28). Nevertheless, even after earlier notes had not been repaid and entered default, Borland,

BCG, and Belize Fund continued to offer and sell Notes to new investors. (*Id.*). In doing so,

Defendants failed to disclose that the overwhelming majority of prior Note investors had not been paid and that prior Notes were in default. (*Id.*).

For example, on April 8, 2015, Borland and Belize Fund sold a $150,000 Note to Investor D that provided for repayment in three months. (Ryba Dec., ¶ 29)  But at that time, Belize Fund already was in default on nearly $3 million of Notes it had sold to prior investors. (*Id.*).  Before he made his investment on the expectation that he would be repaid in three months, Investor D was not told that Belize Fund already had defaulted on nearly identical Notes with the same 3-month term. (*Id.*, ¶ 28).  Investor D's Note has long passed its July 8, 2015 maturity date. But – to this day – Investor D has not been paid any interest or principal. (*Id.*, ¶ 29).

Similarly, on March 30, 2016, a year after Investor D purchased his note – and over 8 months after Investor D's Note entered default – Investor E bought a $500,000 note issued by Belize Fund. (Ryba Dec., ¶ 30).  Though Investor E's Note had a 12-month term, Borland assured Investor E that long-term financing for the Placencia Airport was imminent and the Note would be repaid within a few months. (*Id.*)  Investor E was never told that -- at the time he made his investment -- Belize Fund already had defaulted on Notes sold to Investor D and *all previous investors*. (*Id.*)  As with the other Notes, Investor E's Note is now in default and Investor E has not received any interest or principal payments. (*Id.*)

### 5. Defendants Refused to Provide Testimony and Documents to the SEC

In the course of its investigation, the SEC sought compelled testimony from the following individuals:  Borland, Borland's BCG employee, Alana, and Alana's mother. (O'Brien Dec., ¶¶ 17- 19).  In response, each person refused to answer questions and instead invoked their Fifth Amendment privilege against self-incrimination. (*Id.*).

The SEC also issued document subpoenas to the Defendants and Relief Defendants seeking information including general ledgers, income statements, balance sheets, and other accounting records reflecting how investor proceeds were spent. (O'Brien Dec., ¶¶ 4, 17-18). Again, Defendants and Relief Defendants failed to produce the subpoenaed materials. (*Id.*, ¶¶ 8, 17-18).

### 6.  Defendants' Significant Financial Obligations, Attempts to Dissipate Assets, and Ongoing Solicitation of Investors

The Defendants' financial condition appears to be dire. As discussed above, the Note investors have not been paid back their principal (totaling $21.9 million). The investors are similarly owed massive annual interest payments, in amounts that continue to accrue over time. (Ryba Dec., ¶¶ 18, 47).

Worse, at least three investors have sued Borland, in federal court, relating to the Note offerings. (O'Brien Dec., ¶ 20). Two of those actions resulted in default judgments after Borland failed to defend the lawsuits. (*Id.*). While Borland settled the third lawsuit, he has failed to make the required settlement payments. (*Id.*, Ex. D, ¶ 11). It is not clear how Defendants will repay these obligations, given that minimal amounts of money remain in their bank accounts. (Ryba Dec., ¶ 50).

Faced with heavy and mounting financial obligations, Borland is attempting to liquidate perhaps his most significant asset: the Florida mansion he and Alana have placed on the market for $3.5 million. (Ryba Dec., ¶ 51). As discussed below, an asset freeze is necessary to prevent the dissipation of the proceeds of this sale, and to secure any other money or assets that could be used to compensate the victims of Borland's fraud.

Given their precarious finances, it should not be surprising that Borland and his companies are continuing to solicit new funds from investors. On February 28, 2018, a

purported employee at BCG sent a blast email, from a BCG email account, apprising large numbers of potential investors about "a private co-investment fund." (Ryba Dec., ¶ 48).  On March 6, 2018, the same purported BCG employee, using the same BCG email account, emailed a potential investor a "tearsheet" describing "a private, family-based co-investment vehicle formed by the Borland Family Office for select partners to invest on a side-by-side basis with the family office in portfolio investments across a spectrum of private equity, venture capital, real estate and other unique opportunity sets sourced from proprietary deal flow." (*Id.*).  And on March 16, 2018, another purported employee affiliated with Borland and BCG emailed a potential investor presenting an "asset-backed loan" offering 8.5% annual returns.  (*Id.*).

## ARGUMENT

### I.

### DEFENDANTS SHOULD BE TEMPORARILY RESTRAINED AND PRELIMINARILY ENJOINED FROM FURTHER VIOLATIONS OF THE FEDERAL SECURITIES LAWS AND FROM SOLICITING OR ACCEPTING ADDITIONAL INVESTMENTS

Because Defendants have engaged in recurring fraudulent conduct and are likely to continue to solicit and defraud investors, the Court should grant temporary and preliminary injunctive relief to prevent Defendants from extending their fraudulent conduct while this action is pending.  Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d), entitle the SEC to temporary and injunctive relief against future securities law violations upon a "substantial showing of likelihood of success as to both a current violation and the risk of repetition." *SEC v. Cavanagh*, 155 F.3d 129, 132 (2d Cir. 1998). Because the SEC is "not . . . an ordinary litigant, but . . . a statutory guardian charged with safeguarding the public interest in enforcing the securities laws," its burden to secure temporary or preliminary relief is less than that of a private party. *SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d

801, 808 (2d Cir. 1975). The SEC need not show irreparable injury, a balance of equities in its favor, or the unavailability of remedies at law. *Id.*; *Cavanagh*, 155 F.3d at 132.

The SEC easily meets this standard here. As set forth below, the SEC has made a substantial showing that Defendants have violated the antifraud provisions of the Securities Act and Exchange Act. Many of the acts underlying the violations are either ongoing or likely to reoccur and, if a temporary restraining order is not entered, the Defendants' fraudulent conduct may continue to harm existing investors and ensnare new victims.

### A. The Commission Has Made a Substantial Showing that Defendants Violated the Antifraud Provisions of the Securities Act and Exchange Act

To establish a violation of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5, the SEC must show: (1) a materially false or misleading statement or omission, or use of a fraudulent device; (2) in connection with the purchase or sale (for purposes of the Exchange Act), or in the offer or sale (for the purposes of Securities Act), of securities; and (3) scienter.[2] *See, e.g.*, *Basic Inc. v. Levinson*, 485 U.S. 224, 235 n.13 (1988); *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999).[3]

---

[2] The SEC must establish Defendants acted with scienter to prove violations of Section 17(a)(1) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5. *See Aaron v. SEC,* 446 U.S. 680, 685 (1980). A showing of mere negligence is sufficient to establish a violation of Sections 17(a)(2) and 17(a)(3) of the Securities Act. *See Aaron,* 446 U.S. at 696.

[3] To establish violations of the antifraud provisions, the SEC must also satisfy the interstate commerce element. Courts have routinely held that telephone usage satisfies this element. Indeed, "if a single telephone is used to call the defendants to a meeting at which they engage in fraudulent activity," this element is satisfied. *Richter v. Achs*, 962 F. Supp. 31, 33. (S.D.N.Y. 1997); *SEC v. Stanard*, No. 06 Civ. 7736, 2009 WL 196023, at *25 (S.D.N.Y. Jan. 27, 2009) (telephone, email, and Commission electronic filings constitute use of element of interstate commerce); *see also Heyman v. Heyman*, 356 F. Supp. 958, 969 (S.D.N.Y. 1973) (telephone calls satisfy the element); *Fischer v. New York Stock Exchange*, 408 F. Supp. 745, 757 (S.D.N.Y. 1976) (courts typically use an "exceedingly broad interpretation of this requirement"). Internet activity also satisfies the interstate commerce element. *See Stanard*, 2009 WL 196023, at *25; *SEC v. Ramoil Mgmt., Ltd.*, No. 01 Civ. 9057, 2007 WL 3146943, at *8 (S.D.N.Y. Oct. 25,

Defendants violated the antifraud provisions by making material misrepresentations, and omitting material information, while soliciting investments in the Belize Fund and BCG Notes. For example, Defendants orally and in writing lied to investors by stating that investor funds would be used for the development of the Placencia Airport and by fraudulently assigning the same collateral to multiple investors. All the while, Defendants failed to disclose that Borland would divert substantial portions of investor proceeds for his own personal benefit and other uses unrelated to an airport in Belize. Defendants also hid from investors that the Notes of earlier investors were in default and had not been repaid.

These false and misleading statements and omissions were material because they concerned the very nature of the investment. Facts regarding the use of investor proceeds, the collateral securing the investments, and Defendants' failure to repay earlier investors, were undeniably crucial information for investors, and, thus, were "material." *See, e.g., SEC v. Research Automation Corp.*, 585 F.2d 31, 35-36 (2d Cir. 1978) (misleading statements and omissions concerning the use of money raised from investors are material as a matter of law); *SEC v. Hasho*, 784 F. Supp. 1059, 1109 (S.D.N.Y. 1992) (failure to disclose material negative financial information about issuer violates the antifraud provisions); *SEC v. Texas Gulf Sulfur Co.*, 401 F.2d 833, 849 (2d Cir. 1968) ("material facts include not only information disclosing the earnings and distributions of a company but also those facts which affect the probable future of the company and those which may affect the desire of investors to buy, sell, or hold the company's securities."), *cert. denied*, 394 U.S. 976 (1969).

---

2007) (any of telephone, mail, email, or postings to the online EDGAR database satisfied this element). Defendants, while based in New York City, solicited investors from at least eight states, including Michigan, California, Connecticut, New Jersey, Texas, Florida, Minnesota, and Nevada, while also soliciting investors in New York. (O'Brien Dec., ¶ 23). Defendants also routinely used email to solicit investors. (*Id.*)

In addition, Defendants acted with the requisite scienter. As Belize Fund's and BCG's owner and controlling person, Borland knew that he was diverting significant funds – that he told investors would be used for developing the Placencia Airport – for his personal benefit and to support his family's lavish lifestyle. He knew, when soliciting later investors, that the Notes of earlier investors were in default and that investors had not been repaid. And he knew, or was reckless in not knowing, that investors were being falsely promised that their notes were secured by unencumbered collateral. Borland's scienter is properly imputed to Belize Fund and BCG because he owned and exercised control over those entities. *See SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1089 n.3 (2d Cir. 1972); *In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326, 1340 (S.D. Fla. 1999). And, the fact that Borland and his BCG employee invoked their Fifth Amendment privileges further supports the notion that Defendants acted with scienter. Accordingly, Defendants violated Section 17(a) of the Securities Act, and Section 10(b) of the Exchange Act and Rule 10b-5.

### B. A High Risk Exists that Defendants Will Continue Their Violations

In determining whether to grant injunctions on an emergency basis, courts consider the likelihood that, unless enjoined, a defendant will violate the securities laws again. *Cavanagh*, 155 F.3d at 135. As the Second Circuit instructed in *Management Dynamics, Inc.*:

> Certainly, the commission of past illegal conduct is highly suggestive of the likelihood of future violations. . . . [F]actors suggesting that the infraction might not have been an isolated occurrence are always relevant. . . . Moreover, appellate courts have repeatedly cautioned that cessation of illegal activity does not ipso facto justify the denial of an injunction.

515 F.2d at 807. In assessing likelihood of repetition, courts also look to such factors as the character of the violation, the degree of scienter involved, and the degree to which a defendant's occupation or activities may present future opportunities to violate the law. *See, e.g., Cavanagh*,

155 F.3d at 135; *SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 100-01 (2d Cir. 1978); *SEC v. Musella*, 578 F. Supp. 425, 444 (S.D.N.Y. 1984).

The risk of repetition is established here because Borland has spent the last four years deceiving investors by falsely telling them their investment proceeds would be used to develop an airport in Belize, while concealing that: (1) he was siphoning large amounts of investor money for personal uses, (2) earlier investors were not being repaid as promised, and (3) the collateral purportedly securing the investments were encumbered and incorrectly valued. As demonstrated above, Defendants' violations of the federal securities laws have been egregious and demonstrate a high degree of scienter.

The risk of repetition is further enhanced by the fact that Borland and his companies have continued to solicit investors as recently as March 2018. Given Borland's and his employee's invocation of the Fifth Amendment, the SEC cannot ascertain with certainty whether Defendants have subsequently solicited investments. But, even if there is a temporary lull in the offering, Defendants' precarious financial situation suggests that they will likely continue offering Notes to investors. Indeed, Defendants are in significant debt to investors, both by the terms of the defaulted Notes as well as by judgments obtained by three investors who sued Defendants. The only realistic way for Defendants to satisfy these heavy obligations is to secure fresh funds from unwitting investors.

For these reasons, a temporary restraining order and preliminary injunction are warranted. The Court should enjoin Defendants from violating the securities laws provisions at issue in this action. To protect the public, the Court should also enjoin Defendants from soliciting new investors or accepting additional investments.

## II.

## THE COURT SHOULD ORDER AN ASSET FREEZE AND REPATRIATION

"An asset freeze is a provisional remedy, the purpose of which is to ensure that, in the event that the SEC obtains a judgment, money will be available to satisfy that judgment." *SEC v. Byers*, 08 Civ. 7104, 2009 WL 33434, at *8 (S.D.N.Y. Jan. 7, 2009)*; see also SEC v. Infinity Group Co.*, 212 F.3d 180, 197 (3d Cir. 2000) ("A freeze of assets is designed to preserve the status quo by preventing the dissipation and diversion of assets") (citing *SEC v. Capital Counsellors, Inc.*, 512 F.2d 654 (2d Cir. 1975)); *Smith v. SEC*, 653 F.3d 121, 126-27 (2d Cir. 2011) (affirming asset freeze to prevent dissipation of defendant's assets). Put another way, courts in SEC enforcement actions impose freezes "to ensure 'that any funds that may become due can be collected.'" *Smith*, 653 F.3d at 127 (quoting *SEC v. Unifund SAL*, 910 F.2d 1028, 1041 (2d Cir. 1990)).

Because the SEC is "not … an ordinary litigant, but … a statutory guardian charged with safeguarding the public interest in enforcing the securities laws," its burden to secure temporary or preliminary relief is less than that of a private party. *Management Dynamics*, 515 F.2d at 808. For example, the SEC does not need to show irreparable injury or a balance of equities in its favor. *Id; see also SEC v. Unifund SAL*, 910 F.2d at 1035. Nor does the SEC need to demonstrate the lack of an adequate remedy at law, as private litigants must. *See Cavanagh*, 155 F.3d at 132; *Smith*, 653 F.3d at 127.

Moreover, securing an asset freeze requires a lower showing than that required for a preliminary injunction. *Smith*, 653 F.3d at 127. To that end, to "obtain an asset freeze either against a party accused of wrongdoing or a relief defendant, the SEC must show either a likelihood of success on the merits or that an inference can be drawn that the party [accused of

wrongdoing] has violated the federal securities laws." *Byers*, 2009 WL 33434, at *3 (footnote and citation omitted); *Smith*, 653 F.3d at 128. "To show likelihood of success on the merits, the [SEC] 'need not show that success is an absolute certainty. [It] need only make a showing that the probability of . . . prevailing is better than fifty percent.'" *Byers* at *3 n.5 (quoting *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985)).

When there are concerns that Defendants might dissipate assets, this Court need only find some basis for inferring a violation of the federal securities laws in order to impose a freeze order. *Unifund SAL*, 910 F.2d at 1041 (upholding asset freeze order even though the evidence was insufficient to support entry of a preliminary injunction; "the Commission should be able to preserve its opportunity to collect funds that may yet be ordered disgorged"); *see also SEC v. Heden*, 51 F. Supp. 2d 296, 298 (S.D.N.Y. 1999); *SEC v. Margolin*, No. 92 Civ. 6307, 1992 WL 279735, at *6-7 (S.D.N.Y. Sept. 30, 1992). Accordingly, the Court appropriately imposes a freeze upon a showing of: (1) a concern that the defendant will dissipate his assets or transfer them beyond the jurisdiction of the United States and (2) a basis to infer that the claimed violations of the securities laws occurred. *Unifund SAL*, 910 F.2d at 1041; *SEC v. Gonzalez de Castilla*, 145 F. Supp. 2d 402, 415 (S.D.N.Y. 2001). Here, both requirements are met.

First, there is ample basis for concern about asset dissipation. The Defendants have already siphoned off millions of dollars in investor assets that were supposed to be spent developing an airport in Belize. Moreover, Borland and Alana are currently attempting to sell perhaps their most valuable asset which could be used to compensate the defrauded investors: their $3.5 million Florida home, which they have listed for sale. Further justifying the freeze is the prospect of Defendants moving assets beyond the jurisdiction of this Court, a very real risk given Borland's claimed contacts and business dealings in Belize.

Second, the records and declarations submitted with this application provide ample basis to infer that the fraudulent conduct alleged in the Complaint in fact occurred. As set forth above, Defendants engaged in long-running fraudulent conduct, by lying to investors and misappropriating investor funds. Defendants' fraudulent acts justify ordering an asset freeze.

The Court should also order a freeze over the assets of the Relief Defendants: Borland's wife, Alana, and their company, Canyon Acquisitions. Such relief defendants, also referred to as "nominal" defendants, are persons "not accused of wrongdoing in a securities enforcement action" but who "(1) [have] received ill-gotten funds; and (2) do[] not have a legitimate claim to those funds." *Cavanagh*, 155 F.3d at 136. Assuming these elements are satisfied, the standards for freezing a relief defendant's assets are the same as for freezing a primary defendant's assets. *Id.* at 137; *Smith*, 653 F.3d at 127-128. Alana and Canyon Acquisitions each received millions of dollars in Note investor proceeds. As discussed above, those are ill-gotten funds obtained at the expense of the defrauded investors. Because Alana and Canyon Acquisitions have no legitimate claim to those funds, the asset freeze should be extended to the Relief Defendants to prevent the dissipation of assets that could be used to satisfy a disgorgement award against them.

Additionally, to further effectuate the freeze and ensure the availability of funds for the defrauded investors, the Court should order Defendants and Relief Defendants to repatriate overseas assets that were derived from investor proceeds.

### III.

### THE COURT SHOULD ORDER AN ACCOUNTING

The equitable remedy of a sworn accounting is frequently imposed to provide an accurate measure of unjust enrichment and a defendant's current financial resources. *See*, *e.g.*, *Manor Nursing Ctrs.*, 458 F.2d at 1105; *SEC v. Oxford Capital Sec., Inc.*, 794 F. Supp. 104, 105-06

(S.D.N.Y. 1992); *SEC v. Lybrand*, No. 00 Civ. 1387, 2000 WL 913894, at *12 (S.D.N.Y. July 6,

2000); *SEC v. Bloom*, No. 88 Civ. 201, 1988 U.S. Dist. LEXIS 2487, at *16-17 (S.D.N.Y. Jan.

12, 1988).

The reasons supporting the requested asset freeze apply with equal force to the

SEC's request that the Court order Defendants and Relief Defendants to provide a verified

accounting of their assets.  A prompt and complete accounting will assist in determining whether

any assets remain and where they are located.  Thus, an accounting remedy is needed here to

determine the disposition of funds that Defendants misappropriated through their fraudulent

conduct and the assets available to satisfy any final judgment the Court might enter against each

Defendant and Relief Defendant.

## IV.

### THE COURT SHOULD ENTER AN ORDER PERMITTING EXPEDITED DISCOVERY AND PROHIBITING THE DESTRUCTION OF DOCUMENTS

The Court should order expedited discovery under Fed. R. Civ. P. 30(a), 33(a) and 34(b)

to allow the SEC to supplement its motion for a preliminary injunction.  The Court should grant

the SEC's request for expedited discovery to permit the SEC to act quickly to obtain bank and

other records necessary to identify and preserve investor assets and determine whether

Defendants engaged in any additional frauds.  Expedited discovery is needed to enable the SEC

to present a more complete evidentiary record to the Court and will sharpen and focus the issues

that must be decided by the Court at a hearing on the preliminary injunction motion.

Likewise, the Court should enter an order prohibiting Defendants from destroying,

altering or concealing any documents, to preserve as much of the evidence as possible given the

nature of Defendants' misconduct.

## CONCLUSION

For the foregoing reasons, the SEC respectfully requests that the Court grant the emergency application and enter a temporary restraining order and preliminary injunction enjoining Defendants from future securities laws violations and from soliciting investors or accepting investments, an order freezing and repatriating Defendants' and Relief assets, and other ancillary relief, including an order requiring Defendants and Relief Defendants to provide verified accountings of their assets, permitting the SEC to conduct expedited discovery, and prohibiting Defendants and Relief Defendants from destroying, altering or concealing any documents.

Dated:  May 16, 2018

Respectfully submitted,

**UNITED STATES SECURITIES
AND EXCHANGE COMMISSION**

By: _____
Alyssa Qualls (AQ-4247) (quallsa@sec.gov)
Benjamin J. Hanauer (hanauerb@sec.gov)
(*pro hac vice pending*)
Timothy S. Leiman (leimant@sec.gov)
(*pro hac vice pending*)
Andrew P. O'Brien (obriena@sec.gov)
(*pro hac vice pending*)
Charles J. Kerstetter (kerstetterc@sec.gov)
(*pro hac vice pending*)

Chicago Regional Office
175 West Jackson Blvd., Suite 1450
Chicago, IL 60604
Telephone: (312) 353-7390

*Attorneys for Plaintiff*